113 T.C. No. 27


UNITED STATES TAX COURT



SOUTHERN MULTI-MEDIA COMMUNICATIONS, INC., FORMERLY WOMETCO CABLE
CORP. AND SUBSIDIARIES f/k/a WEXA CABLE, INC. AND SUBSIDIARIES,
Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No 19455-96.                    Filed December 8, 1999.



   <u>Held</u>:  $1,927,396 in costs of certain
improvements to cable television systems does
not qualify for investment tax credit under
the "supply or service" transition rule of
sec. 204(a)(3) of the Tax Reform Act of 1986,
Pub. L. 99-514, 100 Stat. 2085, 2149.


  <u>Val J. Albright</u> and <u>Chester W. Grudzinski, Jr.</u>, for

petitioners.

  <u>Robert M. Morrison</u>, <u>Michael C. Prindible</u>, and

<u>George E. Gasper</u>, for respondent.

SWIFT, <u>Judge</u>:  For the years in issue, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| <u>Year</u> | <u>Deficiency</u> |
|------|------------|
| 1990 | $3,318,947 |
| 1991 | 1,512,979 |
| 1992 | 2,272,661 |
| 1993 | 2,727,882 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement of some issues, the issue remaining for decision is whether costs of certain improvements to petitioners' cable television systems qualify for investment tax credit (ITC) under the supply or service transition rule of section 204(a)(3) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2149.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners constitute an affiliated group of companies engaged in the cable television business.  During the taxable years in issue, Wometco Cable Corp., a Delaware corporation, was the common parent of the affiliated group of companies and maintained its principal office in Miami, Florida.  Hereinafter, petitioners will be referred to simply as Wometco.

Cable television companies seeking to establish cable television service in particular communities enter into franchise agreements with local municipal government entities for the right to construct, operate, and maintain cable television systems within the communities. The franchise agreements reflect the cable television companies' general obligations and commitments regarding construction and maintenance of the cable television systems and the service to be provided to customers.

As of 1985, under such franchise agreements, Wometco operated cable television systems in 179 communities throughout the Southeastern United States.

From 1989 through 1991, at a total cost of approximately $22 million, Wometco undertook extensive improvements to six particular cable television systems that it operated in the suburbs of Atlanta, Georgia (hereinafter sometimes referred to as "the six systems"). These improvements involved replacement of coaxial cable, power supplies, amplifiers, and other electronic components and an increase in the maximum capacity of the six systems from either 36 or 54 channels to 62 channels. In the cable television industry, such improvements are typically referred to as a "rebuild".

With regard to Wometco's six cable television systems that were rebuilt from 1989 through 1991 (hereinafter sometimes referred to as "the six rebuilds"), three of the systems had been

previously rebuilt in 1979. The evidence does not indicate whether the other three cable television systems had been previously rebuilt.

Wometco operated the six cable television systems under approximately 42 separate, local franchise agreements. Wometco's rights under the franchise agreements were nonexclusive and had terms of 10 to 15 years. Most of the franchise agreements contained general language that required Wometco to maintain its cable television systems consistently with the highest accepted standards of the cable television industry so that the customers would receive the highest and most desirable form of service. Also, most of the franchise agreements required Wometco to maintain the systems at a minimum capacity of 20 channels.

Wometco's franchise agreements typically included language that set forth the following requirements:

(a) The CATV system shall be installed and maintained in accordance with the highest accepted standards of the industry to the end that the subscriber may receive the highest and most desirable form of service.

(b) In determining satisfactory compliance with the provisions of this section, the following, among other things, shall be considered:

(1) That the CATV system is installed and remains capable of using all band equipment and of passing the entire VHF and FM spectrum and that it shall have the further capability of converting UHF for the distribution to subscribers on the VHF band.

(2) That the CATV system as installed is capable of transmitting and passing the entire color television signals without the introduction of material degradation of color fidelity and intelligence.

(3) That the CATV system is designed and capable of twenty-four (24) hours a day continuous operation.

(4) That the CATV system is capable of and will produce a picture upon any subscriber's television screen in black and white or color (provided the subscriber's television set is capable of producing a color picture) that is undistorted and free from ghost images and accompanied by proper sound, assuming the technical, standard production television set is in good repair and that the television broadcast signal transmission is satisfactory. In any event, the picture produced shall be as good as the state of the art allows.

(5) That the CATV system shall transmit or distribute signals of adequate strength to produce good pictures with good sound in all television receivers of all subscribers without causing cross modulation in the cables or interference with other electrical or electronic systems.

(6) That the CATV system as installed has a minimum capacity of twenty (20) channels.

If Wometco failed to comply with requirements of the franchise agreements, the franchise agreements could be terminated by the local municipal governments.

As of December 31, 1985, and through January 1, 1991, all of Wometco's cable television systems met the minimum channel capacity requirements set forth in the franchise agreements.[1]

---

[1] Two of Wometco's franchise agreements reflected a minimum capacity of 35 channels, and a number of Wometco's franchise agreements reflected no minimum channel capacity.

As of December 31, 1985, neither the franchise agreements nor any other contracts specifically required Wometco during the years 1989 through 1991 to rebuild the six systems.

In addition to the requirements already set forth, Wometco's franchise agreements generally contained line-extension provisions specifying conditions under which Wometco was required to build new cable lines to serve additional residents of a community.  In the cable television industry, such improvements typically are referred to as "line extensions".

Generally, the line-extension provisions provided that if requests for new cable service were received from at least five residents who resided within 660 feet of existing cable lines, Wometco would be required to build a line extension and extend service at no cost to those residents.

In 1990, also with regard to Wometco's six cable television systems that were rebuilt from 1989 through 1991, Wometco spent an additional $6 million to extend the cable lines of the six systems to provide cable television service to additional customers.  As of December 31, 1985, Wometco was not by contract or otherwise specifically required to build these particular line extensions.

Wometco's franchise agreements reflected various specific requirements relating to surety bonds, franchise fees, insurance coverage, and other matters.

No local government has terminated any of Wometco's franchise agreements for noncompliance with the terms thereof, has declined to extend any of Wometco's franchise agreements after expiration of the term, or has at any time specifically requested Wometco to rebuild any of its cable television systems.

For 1990 through 1993, Wometco timely filed consolidated U.S. Corporation income tax returns claiming $1,927,396 in cumulative ITC relating to costs of the six rebuilds that were undertaken from 1989 through December 31, 1990, the line extensions that were built in 1990, and a small ITC carryforward relating to costs of line extensions built in 1986, 1987, and 1989.

On audit, respondent disallowed the total $1,927,396 in ITC claimed by Wometco relating to the six rebuilds and the line extensions.

OPINION

Before 1986, ITC was allowed under section 46 for the costs of certain types of property. In 1986, Congress eliminated ITC for the costs of property placed in service after December 31, 1985. See Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, sec. 211(a), 100 Stat. 2085, 2166, adding Code sec. 49(a).

Several transition rules, however, were provided that preserved ITC for the costs of qualified property placed in service after December 31, 1985, and before January 1, 1991, as

long as the contracts relating to the costs of the property were entered into on or before December 31, 1985.  See TRA 1986, sec. 204(a), 100 Stat. 2146, as amended by TRA 1986, sec. 211, 100 Stat. 2167 (adding Code sec. 49(e)(1)(B)).

Under one of the transition rules that relates specifically to "supply or service" contracts, taxpayers were allowed ITC for qualified property costs that were "readily identifiable with and necessary to carry out" written contracts that were binding on or before December 31, 1985 (hereinafter referred to as "the supply or service transition rule").  TRA 1986, sec. 204(a)(3), 100 Stat. 2149, as amended by TRA 1986, sec. 211, 100 Stat. 2167 (adding Code sec. 49(e)(1)(B)).  The supply or service transition rule, as amended and in effect for the years in issue, provided as follows:

> (3) Supply or service contracts.--The amendments made by section 201 shall not apply to any property which is readily identifiable with and necessary to carry out a written supply or service contract, or agreement to lease, which was binding on December 31, 1985.

Id.

With regard to the January 1, 1991, cutoff date, the transition rules provided as follows:

> (2) Requirement that certain property be placed in service before certain date.--
> (A) In general.--Paragraph (1) and section 204(a)(other than paragraph (8) or (12) thereof) shall not apply to any property unless such property has a

class life of at least 7 years and is placed in service before the applicable date determined under the following table:

| In the case of property with a class life of: | The applicable date is: |
|---|---|
| At least 7 but less than 20 years | January 1, 1989 |
| 20 years or more | January 1, 1991. |

\*      \*      \*      \*      \*      \*      \*

(C) \* \* \*
    (ii) property described in section 204(a) shall be treated as having a class life of 20 years \* \* \*.

TRA 1986, sec. 203(b)(2), 100 Stat. 2144.

In interpreting statutory language, courts look first to whether the relevant statutory language itself is plain and unambiguous. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842 (1984). If the statutory language is plain and unambiguous, courts ordinarily do not look beyond the statutory language. See United States v. Ron Pair Enters., Inc., supra; Tele-Communications, Inc. v. Commissioner, 95 T.C. 495, 510 (1990), affd. 12 F.3d 1005 (10th Cir. 1993) (the "plain language of a statute is the source of its interpretation."). If the statutory language is ambiguous, courts may consider the legislative history. See Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); Golden Rod Farms, Inc. v. United States, 115 F.3d 897, 899 (11th Cir. 1997); Greenberg Bros. Partnership #4 v. Commissioner, 111 T.C. 198, 203 (1998).

Wometco bears the burden of showing that it meets the requirements of the supply or service transition rule and that it is entitled to the tax credits sought.  See Rule 142(a).

Wometco argues that the costs associated with the six rebuilds and the line extensions in issue were readily identifiable with, and necessary to carry out, its related franchise agreements that were outstanding as of December 31, 1985.  Wometco contends that the general language of the franchise agreements that existed as of December 31, 1985, requiring Wometco to maintain its cable television systems in a state-of-the-art condition, is sufficient to qualify the six rebuilds and the line extensions under the supply or service transition rule.

Respondent argues that under Wometco's franchise agreements Wometco was not expressly required to undertake particular rebuilds or line extensions, that only 20-channel capacity systems were generally required, that Wometco's systems already met that requirement, and that as of December 31, 1985, the six rebuilds and the line extensions were not necessary to carry out and were not readily identifiable with Wometco's general franchise agreements that existed on December 31, 1985.

The language of the supply or service transition rule specifically used the words "necessary to carry out".  The word "necessary" connotes essential, mandatory, indispensable, or

requisite. See Webster's Third New International Dictionary 1510 (1986). The language in Wometco's franchise agreements does not, as of December 31, 1985, mandate, make indispensable, or make necessary the rebuilds in issue. Wometco's rebuilds that occurred after December 31, 1985, and before January 1, 1991, may reflect sound business decisions by Wometco in order to maintain the competitiveness of its cable television systems and to facilitate eventual renewal of the franchise agreements. As of December 31, 1985, however, Wometco was not required by specific contract to undertake the six rebuilds.

In interpreting the supply or service transition rule, Wometco relies heavily on discussions that occurred on June 24, 1986, on the floor of the U.S. Senate as part of the congressional debate over provisions of the Tax Reform Act of 1986 as follows:

> Mr. FORD: * * * I simply want to make sure that those agreements to build and rebuild cable systems under cable franchise are treated as transition property under the supply or service contract rule. * * * Was it the intention of the Finance Committee to include cable television franchise agreements within the service and supply contract rule?

> Mr. PACKWOOD: The Senator is correct. The committee intends that cable television franchises generally do qualify as "supply or service contracts" for purposes of section 202(d)(3) relating to transition rules. * * *

132 Cong. Rec. 15039 (1986).

Mr. MATSUNAGA: I would like to ask the bill managers to clarify another point. The supply or service contract transition rule requires that the property be readily identifiable with and necessary to carry out the contract. The committee report explains that the specifications and the amount of the property must be readily ascertainable from the terms of the contracts or from related documents.

Is this Senator's understanding correct that the requirement is met when a binding power purchase contract specifies the type of generating equipment in terms of primary energy source and specifies the amount of generating equipment in terms of total generating capacity of the turbines necessary to produce the contracted power? In other words, the rule does not require the technical details of the generating property to be spelled out.

Mr. PACKWOOD: The Senator from Hawaii is correct.

132 Cong. Rec. 15028 (1986).

Wometco argues that the above discussions between Senators bolsters its argument that (in order to qualify under the supply or service transition rule) specific rebuilds and line extensions need not be expressly identified in construction contracts outstanding as of December 31, 1985, but rather that the general language of its franchise agreements that were outstanding as of December 31, 1985 (requiring that Wometco's systems be maintained according to the "highest accepted standards of the industry", the "highest and most desirable form of service", and the "state of the art"), is sufficient to bring the six rebuilds and line extensions that in fact were undertaken and built between

December 31, 1985, and January 1, 1991, within the supply or service transition rule.

Although this Court has not yet interpreted the supply or service transition rule, three other Federal courts have.  In Bell Atl. Corp. v. United States, 82 AFTR 2d 98-7375, at 98-7379, 99-1 USTC par. 50,119, at 87,037 (E.D. Pa. 1998), the taxpayer argued that because franchise agreements outstanding as of December 31, 1985, required that it broadly "maintain, expand, and improve their telephone networks" to meet industry standards, property purchased after December 31, 1985, to upgrade telephone network equipment satisfied the supply or service transition rule.  The Federal District Court for the Eastern District of Pennsylvania, however, concluded that none of the property was necessary to carry out any of the taxpayer's franchise agreements.  The court stated that the general language of the franchise agreements involved in that case was not sufficient to qualify under the supply or service transition rule.

In United States v. Zeigler Coal Holding Co., 934 F. Supp. 292, 295 (S.D. Ill. 1996), the Federal District Court for the Southern District of Illinois, in denying summary judgment, stated that "in order to be eligible * * * [under the supply or service transition rule] the property must have been specifically described."  The court noted that it could not find language in the taxpayer's relevant contracts as they existed as of

December 31, 1985, that sufficiently described most of the property upon which ITC was claimed.

In United States v. Commonwealth Energy Sys., 49 F. Supp. 2d 57 (D. Mass. 1999), after December 31, 1985, the taxpayer installed new power generating equipment in its power plant. The taxpayer claimed that the new equipment was necessary to carry out specific power supply contracts that had been entered into before December 31, 1985. Language of the contracts indicated the type of power generating equipment to be installed in terms of primary energy source and total generating power. The contracts specifically stated that the taxpayer agreed and was bound under the contracts "to cause to be built a new conventional steam plant * * * of an expected net economic capability of approximately 560 megawatts". Id. at 59. The Federal District Court for the District of Massachusetts concluded that despite the absence in the contracts of explicit language describing the precise equipment to be installed, the new generating equipment that was to be installed was readily identifiable with the contracts and was plainly required to fulfill the specific additional power commitments that were explicitly set forth in the contracts.

The District Court in Commonwealth Energy Sys., however, did not allow ITC for all of the costs associated with the new power generating equipment. The court disallowed ITC for costs of

certain property that was not "intimately connected to the generation of power at the plant". Id. at 61. Property that was too tenuously tied to generation of the new power commitment reflected in the contracts as of December 31, 1985, was held not to qualify under the supply or service transition rule.

Under Wometco's argument, most if not all of its otherwise eligible property costs incurred after December 31, 1985, and before January 1, 1991, would likely qualify under the supply or service transition rule because all improvements to its systems arguably would be readily identifiable with and necessary to carry out the broad franchise agreements that were in effect as of December 31, 1985. As we read the supply or service transition rule, however, the plain meaning of the statute does not permit this interpretation. Congress granted only limited, transition relief to businesses that, as of December 31, 1985, had binding commitments to undertake specific investments in qualified property. See Bell Atl. Corp. v. United States, 82 AFTR 2d at 98-7378, 99-1 USTC at 87,036; H. Conf. Rept. 99-841 (Vol. II), 1986-3 C.B. (Vol. 4) 60.

Much like the franchise agreements involved in Bell Atl. Corp. v. United States, supra, the general language of Wometco's franchise agreements, without more, reflects only broad industry standards, not specific contractual commitments to undertake rebuilds.

The language of Wometco's franchise agreements does reflect various specific requirements for surety bonds, franchise fees, and insurance coverage.  Specific language, however, regarding rebuilds is conspicuously absent from the franchise agreements. The only language in Wometco's franchise agreements expressly referencing channel capacity, the key factor triggering rebuilds, is the language that requires maintenance of a minimum channel capacity.

Technology growth in the cable television industry has been particularly rapid.  As of the time of trial, utilizing new digital video compression and fiber optic cable, the latest technology would enable cable television companies to rebuild their systems to a capacity of 500 channels and to provide high speed Internet access.  To maintain, during each year, completely state-of-the-art systems, cable television companies would have had to rebuild their systems every few years.[2]  To the contrary, with regard to the six cable television systems in issue, Wometco

---

[2]    The schedule below reflects the changing cable television technology available throughout the years with regard to channel capacity:

| Year | Maximum Channel Capacity |
|------|--------------------------|
| 1967 | 23 |
| 1979 | 40 |
| 1981 | 54 |
| 1982 | 60 |
| 1984 | 80 |
| 1993 | 115 |
| 1995 | 136 |
| 1999 | 500 |

has rebuilt three of the systems only twice since the late 1970's.

Wometco notes that since franchise agreements entered into by cable television companies in the 1970's and 1980's rarely included express rebuild requirements, few companies would receive any benefit under a narrow interpretation of the supply or service transition rule. We disagree. Rebuilds and line extensions that were specifically under contract as of December 31, 1985, would be readily identifiable with and would be treated as necessary to carry out specific contracts for such improvements and would qualify for ITC under the supply or service transition rule.

We conclude that Wometco is not entitled to ITC for the costs of the six rebuilds. As of December 31, 1985, Wometco was not under contract to install the six rebuilds, and the rebuilds were not necessary to carry out Wometco's extant franchise agreements. With regard to the line extensions, no evidence indicates that Wometco had specific binding commitments, as of December 31, 1985, to install the line extensions.[3]

Wometco is not entitled to the claimed ITC for the costs of the rebuilds and the line extensions.

---

[3]   As indicated, we decide this case on the basis that the six rebuilds and line extensions were not necessary to carry out Wometco's franchise agreements. We do not decide the issue of whether the six rebuilds and line extensions were "readily identifiable with" Wometco's franchise agreements.

To reflect the foregoing,

Decision will be entered
under Rule 155.