T.C. Memo. 2002-176


UNITED STATES TAX COURT


MAINE YANKEE ATOMIC POWER COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15446-98.                    Filed July 29, 2002.


<u>Edwin A. Heisler</u> and <u>William K. McKinley</u>, for petitioner.

<u>Marvis A. Knospe</u> and <u>Barry Laterman</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COHEN, <u>Judge</u>:  Respondent determined deficiencies of $408,949 and $710,318 in petitioner's Federal income tax for 1990 and 1991, respectively.  After concessions, the remaining issue for decision is whether petitioner is entitled to an investment tax credit with respect to nuclear fuel assemblies placed in service in 1990.  Unless otherwise indicated, all section

references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner Maine Yankee Atomic Power Company was incorporated under the laws of Maine in 1966 and had its principal place of business in Wiscasset, Maine, at the time the petition in this case was filed.

Petitioner owned and operated a nuclear power electric generating plant (plant) that utilized a pressurized water reactor, fueled with slightly enriched uranium oxide. The plant was located in Wiscasset, Maine, on an 820-acre site that was owned in fee by petitioner.

The stockholders of petitioner were investor-owned New England utility companies. In 1990, petitioner was owned by 10 investor-owned New England utility companies, each of which was committed under a power contract dated May 20, 1968 (power contracts), to purchase a percentage of the capacity and output of the plant equivalent to its percentage ownership.

The construction permit for the plant was issued in October 1968 by the Atomic Energy Commission (AEC). Construction of the plant was completed in 1972, except for certain discharge

temperature control facilities designed to meet the requirements of the Maine Board of Environmental Protection, which were completed in 1975. The plant began commercial operation in December 1972 under Facility Operating License No. DPR-36 dated September 15, 1972 (operating license). The plant was closed for economic reasons in August 1997.

The Nuclear Regulatory Commission (NRC) oversees the safety of all U.S. nuclear power plants. NRC reviews the initial plans before issuing a construction permit and reviews the plant as built before issuing an operating license. The NRC assumed the regulatory responsibilities of AEC, its predecessor organization, in a 1975 reorganization.

Petitioner's nuclear power facility used fuel assemblies, which contained fuel rods, in the reactor core to generate energy. The reactor core consisted of 217 fuel assemblies. Before new fuel assemblies could be placed in the reactor core, petitioner submitted an application to the NRC for an amendment to its operating license.

For purposes of this case, a fuel cycle (Cycle) begins upon the shutdown of the prior cycle, continues through refueling, followed by an operating cycle, and ends upon shutdown. During shutdown, the plant is taken offline for refueling, maintenance, and planned construction activities. The first 12 reloads, designated Cycle 1A through Cycle 12, occurred one each in 1974,

1975, 1977, 1978, 1980, 1981, 1982, 1984, 1985, 1987, 1988, and 1990.

For Cycles 3 through 12, there were 72 fuel assemblies that were replaced with 72 new fuel assemblies.  The 72 fuel assemblies in issue in this case were for Cycle 12 and were placed in service on June 30, 1990.  Cycle 12, including the shutdown for reload and the operating cycle, began on April 7, 1990, and ended on February 14, 1992.  The total cost of the fuel assemblies for Cycle 12 was $28,181,923, with an approximate cost of $391,500 for each of the 72 fuel assemblies.  The fuel assemblies that were used by petitioner had a class life of 5 years under the Modified Accelerated Cost Recovery System (MACRS).

Petitioner's goal was to produce electricity as economically as possible, and, in order to minimize fuel costs, petitioner used a variety of tail assays, varied enrichment levels, and a combination of uranium procurement and enrichments.  Although fit and form of the fuel assemblies may have been essentially the same, the function, or performance, of the fuel assemblies changed over the course of the operation of the plant.  For example, higher enrichment levels in the fuel assemblies allowed for a longer operating cycle.

Petitioner entered into general contracts for fuel assembly fabrication services.  Because petitioner sought maximum

flexibility in all of its contracts, the actual number and specifications of the fuel assemblies ordered were established by purchase order and paid pursuant to invoices.

Power Contracts and Amendments

In regards to the operation and maintenance of the plant, the power contracts entered into between petitioner and owners, who were also purchasers, state:

> Maine Yankee [petitioner] will operate and maintain the Unit [plant] in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954, as amended, and of any licenses issued thereunder to Maine Yankee. Within the limits imposed by good utility practice under the circumstances and applicable law, the Unit will be operated at its maximum capability and on a long hour use basis.

> Outages for inspection, maintenance, refueling and repairs and replacements will be scheduled in accordance with good utility practice and insofar as practicable shall be mutually agreed upon by Maine Yankee and the Purchaser. In the event of an outage, Maine Yankee will use its best efforts to restore the Unit to service as promptly as practicable. [Emphasis added.]

Amendments to the power contracts were made in 1984. The purpose of "Amendment No. 1 to Power Contract" dated March 1, 1984, was to incorporate the costs of decommissioning the plant into the contractual payments from the owners. The purpose of "Amendment No. 2 to Power Contract" dated January 1, 1984, was to change the formula for computing charges to the purchasers in order to allow for a higher return on equity than was provided in

the power contracts. The purpose of "Amendment No. 3 to Power Contract" dated October 1984 was to bring petitioner into compliance with an August 1984 order by the Federal Energy Regulatory Commission (FERC) requiring that the power contracts be amended to conform to FERC's regulations regarding the treatment of nuclear fuel in process in rate base.

An "Additional Power Contract" was dated February 1, 1984, and its operative terms were to commence in January 2003. The additional power contracts had two purposes: to extend the power contracts from their original January 2003 termination date and to provide for the collection and handling of funds for the decommissioning of the plant.

The availability of the investment tax credit had no impact on the decision by petitioner to enter into the power contracts or the subsequent amendments to the power contracts. Also, when petitioner entered into the power contracts in 1968, it could not have predicted whether any fuel assemblies would be put in service at the plant in 1990.

Operating License and Amendments

The operating license, dated September 15, 1972, authorized fuel loading, low power testing, and further operations at power levels not in excess of 1830 megawatts thermal (MWT), 75 percent of the facility's rated power level of 2440 MWT. In 1978, the plant was authorized to increase its rated power level from

2440 MWT to 2630 MWT; in 1989, a second increase to 2770 MWT was authorized.

Changes with respect to the plant, including changes related to fuel assemblies, were submitted by petitioner to the NRC and, if considered safe, the changes were approved through the issuance of an amendment to the operating license. Petitioner's application for amendment to the operating license for Cycle 12 was submitted to the NRC and dated January 16, 1990. In response to petitioner's application, Amendment No. 116 to the operating license was issued by the NRC on May 17, 1990. Amendment No. 116 states, in part:

1. The Nuclear Regulatory Commission (the Commission or the NRC) has found that:

   A. The application for amendment filed by Maine Yankee Atomic Power Company [petitioner] (the licensee) dated January 16, 1990 complies with the standards and requirements of the Atomic Energy Act of 1954, as amended (the Act), and the Commission's rules and regulations set forth in 10 CFR Chapter I;

   *   *   *   *   *   *   *

   C. There is reasonable assurance: (i) that the activities authorized by this amendment can be conducted without endangering the health and safety of the public, and (ii) that such activities will be conducted in compliance with the Commission's regulations set forth in 10 CFR Chapter I;

   D. The issuance of this amendment will not be inimical to the common defense and security or to the health and safety of the public; * * *

Tax Returns

Petitioner did not claim an investment tax credit with respect to the nuclear fuel assemblies that were placed in service in 1990 on its 1990 Form 1120, U.S. Corporation Income Tax Return. Based on the advice of its accountants, petitioner filed a Form 1120X, Amended U.S. Corporation Income Tax Return, on September 14, 1994, claiming an additional investment tax credit. Petitioner claimed an investment tax credit of $1,831,825 with respect to the fuel assemblies placed in service in 1990. Respondent disallowed petitioner's claim for refund in a notice of deficiency that included other adjustments.

OPINION

The issue presented is whether petitioner is entitled to an investment tax credit with respect to the fuel assemblies that were placed in service in 1990. Prior to 1986, an investment tax credit was available pursuant to sections 38(b), 46, and 48 for investments in certain types of tangible property placed in service during the taxable year. The credit was repealed by section 211 of the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, 100 Stat. 2166, which added section 49 to the Internal Revenue Code. Section 49(a) made the investment tax credit inapplicable to property placed in service after December 31, 1985. Because TRA 1986 did not become law until October 22,

1986, the repeal of the investment tax credit was necessarily retroactive.

Several transition rules were provided that preserve the investment tax credit for the costs of transition property placed in service after December 31, 1985, and before January 1, 1991, as long as the contracts relating to the costs of the property were entered into on or before December 31, 1985. See TRA 1986 sec. 204(a), 100 Stat. 2146, as amended by TRA 1986 sec. 211, 100 Stat. 2167 (adding Code sec. 49(e)(1)(B)). To qualify for the transition rules under section 204(a), transition property with a class life of 20 years or more must be placed in service before January 1, 1991. See TRA 1986 sec. 203(b)(2)(A), 100 Stat. 2144.

Section 204(a)(3) of TRA 1986 provides the transition rule for supply and service contracts. TRA 1986 sec. 204(a)(3), 100 Stat. 2149. As modified, section 204(a)(3) of TRA 1986 states:

> (3) Supply or service contract.--The amendments made by section 201 shall not apply to any property which is <u>readily identifiable with and necessary to carry out</u> a written supply or service contract, or agreement to lease, which was binding on * * * [December 31, 1985]. [Emphasis added.]

The parties have stipulated that the power contracts and amendments as of December 31, 1985, qualify as binding written supply or service contracts under section 204(a) of TRA 1986. They disagree about whether the fuel assemblies installed in 1990 qualify under the transition rule of section 204(a)(3) of TRA 1986.

Previous cases have looked to H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) at 60, for guidance in interpreting the phrase "readily identifiable with and necessary to carry out" in section 204(a)(3) of TRA 1986.  Id.; United States v. Commonwealth Energy Sys., 235 F.3d 11 (1st Cir. 2000); Bell Atl. Corp. v. United States, 224 F.3d 220 (3d Cir. 2000).  H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) at 60, states:

> This transitional rule is applicable only where the specifications and the amount of the property are readily ascertainable from the terms of the contract, or from related documents.  A supply or service contract or agreement to lease must satisfy the requirements of a binding contract * * *  [Emphasis added.]

Petitioner contends that the fuel assemblies placed in service in 1990 qualify as transition property under the provision for supply or service contracts in section 204(a)(3) of TRA 1986, because the fuel assemblies were readily identifiable in documents related to the power contracts and necessary to carry out the power contracts.  Petitioner acknowledges that there were no documented specifications for the fuel assemblies in the power contracts; however, petitioner argues that the operating license and amendments and appendices thereto are documents related to the power contracts and that these "related documents" provide the amount and specifications of the nuclear fuel assemblies.

Respondent does not dispute that the fuel assemblies were necessary for petitioner to carry out the terms of the power contracts. Instead, respondent contends that the operating license and amendments and appendices thereto are not "related documents" to the power contracts.

In Bell Atl. Corp. v. United States, supra, a telecommunications service provider claimed the investment tax credit for major improvements to its telephone systems. The taxpayer asserted that the franchises, tariffs, and contracts with other local telephone companies were written service contracts. The court did not find it necessary to decide whether the franchises, tariffs, and contracts were written service contracts but, instead, focused on whether any of the property improvements were readily identifiable with and necessary to carry out the contracts. The court found that the "franchises, tariffs, and other contracts contain service quality standards that regulate telephone service, impose conditions on service and set service goals." Id. at 223-224. The court reasoned that the property for which the taxpayer sought an investment tax credit "cannot be determined from the terms of any of the tariffs, franchises, or other contracts * * * because these alleged 'contracts' speak only of service quality standards, never mentioning property of any sort." Id. at 224.

The taxpayer in Bell Atl. Corp. also asserted that its estimate files were related documents because the estimate files documented the purchase of and need for the new property under the service quality standard. The court held "that property cannot be shown to be 'readily identifiable with' a written service contract by means of internally generated documents, such as the estimate files * * *, that were not prepared contemporaneously with the contract, that had no binding effect on anyone, and that were not provided to the other contracting party". Id. at 225.

In S. Multi-Media Communications, Inc. v. Commissioner, 113 T.C. 412 (1999), a cable television company claimed the investment tax credit for property used to make extensive improvements to some of its systems and to extend its lines in some of its service areas. Even though the company's franchise required that the system be "maintained in accordance with the highest accepted standards of the industry", this Court held that "the general language of * * * franchise agreements, without more, reflects only broad industry standards, not specific contractual commitments to undertake rebuilds." Id. at 414, 421.

In United States v. Commonwealth Energy Sys., supra, the taxpayer entered into a set of power contracts with other utilities in 1965, pursuant to which it agreed to build a power plant and the other utilities agreed to purchase the plant output

for a specified period of years. The contracts required the taxpayer to build "a new conventional steam plant" with a capability of "approximately 560 megawatts", and the taxpayer was required to "operate and maintain" the plant "in an economical and efficient manner and in accordance with good utility practice and all applicable law". Id. at 12. In 1990 and 1991, the taxpayer made several repairs and improvements to the plant and sought the investment tax credit under the transition rules for supply and service contracts provided for in section 204(a)(3) of TRA 1986. The Court of Appeals for the First Circuit stated that the conference report was helpful because "the requirement that the specifications and amount of the property be readily ascertainable indicates that the inquiry need be specific, although not exact." Id. at 16. The Court of Appeals held that the taxpayer was not entitled to the investment tax credit under the transition rules for the cost of repairs and improvements made to its plant because the contracts did not contain the amount or specifications of potential replacement parts, and there was no contractual obligation for the taxpayer to replace parts on a specific schedule. Id.

We conclude that the operating license and amendments thereto in this case are not related documents to the power contracts. Here, the operating license and amendments and appendices thereto were not incorporated by reference into the

power contracts.  The only reference to the operating license in the power contracts was to a general standard of operation and maintenance that was "in accordance with good utility practice and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954, as amended, and of any licenses".  This general standard of operation and maintenance, without more, does not incorporate the operating license, or amendments or appendices thereto, into the power contracts.

The operation of the plant was subject to many laws and regulations.  For any changes that petitioner wanted to make in its plant equipment or operations, it had to submit an application for an amendment to its operating license to the NRC.  Petitioner's application was then subject to the review and approval of the NRC.  Thus, the operating license and amendments and appendices thereto resulted from internally generated documents that were submitted to NRC by petitioner for approval.  The purpose of the NRC was to oversee nuclear power plants, protect the health and safety of the public, and assure compliance with the law.  NRC did not initiate or require petitioner to make modifications to its plant equipment or operations.

The operating license was not prepared contemporaneously with the power contracts.  The power contracts were entered into on May 20, 1968, and the operating license was issued on

September 15, 1972.  Petitioner's application for Amendment No. 116 to its operating license with respect to the fuel assemblies for Cycle 12 was not submitted to the NRC until January 1990, and the amendment was not issued by the NRC until May 1990.  The fuel assemblies for Cycle 12 were placed in service in June 1990.

Based on our conclusion that the operating license and amendments and appendices thereto are not related documents, we look solely to the power contracts and amendments thereto that were entered into prior to December 31, 1985.  Petitioner acknowledges in its brief that there were no documented specifications for the fuel assemblies in the power contracts. We therefore conclude that the Cycle 12 fuel assemblies do not qualify as transition property under the supply or service contract transitional rule set forth in section 204(a)(3) of TRA 1986, because the fuel assemblies were not readily identifiable with the power contracts or amendments thereto, and the operating license and amendments and appendices thereto are not related documents to the power contracts.  Thus, we need not decide whether the Cycle 12 fuel assemblies meet the class life and placed in service requirements under TRA 1986 sections 203(b) and 211(e) as modified by section 49.

To reflect the foregoing,

Decision will be entered

under Rule 155.