**UNITED STATES of America, Plaintiff,**

v.

**COMMONWEALTH ENERGY SYSTEM AND SUBSIDIARY COMPANIES, Defendants.**

**No. 97–11722–JLT.**

United States District Court, D. Massachusetts.

May 18, 1999.

George P. Eliopoulos, U.S. Department of Justice, Tax Division, Washington, DC, for USA, plaintiff.

Richard P. Swanson, Susan Logan Bedford, Reid & Priest, New York City, Michael K. Callahan, Commonwealth Energy Services Co., Cambridge, MA, for Commonwealth Energy System, Commonwealth Energy Systems and Subsidiary Companies, defendant.

## *MEMORANDUM*

TAURO, District Judge.

Plaintiff United States of America ("USA") claims that Defendants Common-

wealth Energy System and subsidiary companies ("Commonwealth") owe roughly $600,000, plus interest, for tax refunds erroneously given to Commonwealth for the 1990 and 1991 tax years. The parties have filed cross motions for summary judgment.

## I. ANALYSIS

This dispute turns on whether Commonwealth was entitled to the tax credit it received for capital additions it made to its power plant on the Cape Cod Canal. A brief history of the statutory provision at issue helps guide the analysis.

Before 1986, to encourage investment, the Internal Revenue Code gave qualifying businesses an investment tax credit ("ITC") for various types of tangible personal property that the businesses placed in service during the tax year. *See Illinois Cereal Mills, Inc. v. C.I.R.*, 789 F.2d 1234, 1236 (7th Cir.1986). The Tax Reform Act of 1986 ("Reform Act") reversed course by eliminating the ITC for most property acquisitions. 26 U.S.C. § 49.

The Reform Act did not completely obliterate the ITC, however. Under one of the Reform Act's "transition provisions," businesses can claim an ITC for property that is *readily identifiable with* and necessary to carry out a written supply or service contract ... which was binding on [December 31, 1985]." Reform Act § 204(a)(3) (emphasis added). Commonwealth claimed the now-contested credit under this transition provision. Plaintiff USA does not dispute that the supply contract under which Commonwealth claimed the credit was a binding agreement as of December 31, 1985. The meaning of the

phrase "readily identifiable with" is at the heart of this dispute.

The phrase "readily identifiable with" is ambiguous. Both parties cite to dictionary definitions of the individual words to support different interpretations.[1] The language alone thus does not resolve the dispute.

Plaintiff USA urges a narrow interpretation that would bar Commonwealth's ITCs. In support, Plaintiff refers to the congressional conference committee report, which states that the transition provision "is applicable only where the specifications and amount of the property are readily ascertainable from the terms of the contract, or from related documents." H.R.Rep. No. 99–841, pt. 2, at 60 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4148. Plaintiff argues that this conference committee report language means that the transition provision only applies where the contract or related documents *explicitly* refer to the property that forms the basis for the credit claim. From that interpretation, Plaintiff argues that Defendants did not qualify for the "readily identifiable" transition provision exception, because Defendants' power supply contracts did not explicitly set forth the specifications and amount of any of the property on which Defendants claimed the credit and obtained the refund.

Plaintiff's interpretation is unduly narrow. This court does not interpret the conference report as a manifestation of congressional intent to limit the transition tax credit provision to property explicitly designated in a supply contract. For example, where a contract requires a taxpayer to supply a specific amount of power in

---

1. Commonwealth argues that the phrase plainly means " 'likely or apt to be connected or associated with' a particular supply contract." Defendants' Memorandum in Support of Summary Judgement at 12 (internal quotation marks added) (citing *Merriam Webster's New Collegiate Dictionary* 575, 592 (10th ed.1993) (defining "readily" as *in a ready manner* "as without hesitation" or "without much difficulty;" defining "identify" as "to

conceive as united") and *Roget's II The New Thesaurus* (1980) (stating that "identify" is synonymous with "associate" and "to bring together in one's mind or imagination")). Plaintiff argues that the same sources "could also be cited to define the phrase as 'capable of quickly or easily establishing the identity of' the property from the contracts." Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgement at 2.

a specific manner, one could arguably "readily ascertain from" the contract that the taxpayer/supplier would have to purchase and install a certain type of generator to supply the required power, even if the contract did not mention generators at all.

This broader interpretation of the "readily ascertainable" conference report language (which language elaborates on the "readily identifiable with" statutory language at issue) is supported by the following colloquy that occurred during Senate debate on the transitional rule:

> MR. MATSUNAGA: I would like to ask the bill managers to clarify another point. The supply or service contract transition rule requires that the property be readily identifiable with and necessary to carry out the contract. The committee report explains that the specifications and the amount of the property must be readily ascertainable from the terms of the contract or from related documents. Is this Senator's understanding correct that the requirement is met when a binding power purchase contract specifies the type of generating equipment in terms of primary energy source and specifies the amount of generating equipment in terms of total generating capacity of the turbines necessary to produce the contracted power? In other words, the rule does not require the technical details of the generating property to be spelled out.
>
> MR. PACKWOOD: The Senator from Hawaii is correct.
>
> MR. LONG: The Senator's understanding is correct.

132 Cong. Rec. S8241 (daily ed. June 24, 1986).

The facts in Senator Matsunaga's hypothetical are the facts in this case. Com-

monwealth's power supply contract specifies both (1) the type of generating equipment in terms of primary energy source; and (2) the amount of generating equipment in terms of total generating power. *See* Supply Contracts, Joint Exhibit 1 at 1–2 (stating that Commonwealth "agree[d] to cause to be built a new conventional steam plant ... of an expected net economic capability of approximately 560 megawatts, on the so-called 'Canal Site' in Sandwich, Massachusetts").[2]

In addition, Congress's use of the ambiguous phrase "readily identifiable with" undercuts Plaintiff's interpretation. Had Congress intended to impose a requirement that the property be explicitly listed in the supply contract, Congress likely would have used any of a number of readily available phrases to establish the requirement (e.g. "property explicitly listed in a supply contract" or "property specifically mentioned in a supply contract").

Plaintiff unpersuasively urges the court to disregard the Senatorial colloquy as unreliable evidence of legislative intent. Plaintiff relies on Supreme Court cases that favor committee reports over "casual" floor statements from one house. *See, e.g, Garcia et al. v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) ("[W]e have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill.... We have eschewed reliance on the passing statements of one Member ... and casual statements from the floor debates.") (citations omitted).

*Garcia* and similar Supreme Court cases do not require that the court disregard all highly probative floor statements. To begin with, *Garcia* and like cases disapprove of "casual statements" from floor debates. The colloquy in this case involved anything

---

**2.** The contract further provides that Commonwealth will "use all due diligence to deliver to the Purchaser regularly and without interruption the electricity to which it is entitled under this Contract ..." and that "[i]n the event

of an unscheduled outage due to the failure or impairment of any equipment or other cause, [Defendants] will use its best efforts to restore the [plant] to service as promptly as possible." Joint Exhibit 1 at 11–13.

but "casual statements." The colloquy directly addressed the issue in this case, with a focused question and answers from two Senator-managers of the bill. *Cf. id.* at 78, 105 S.Ct. 479 (stating that floor statement was less probative of legislative intent because (1) the statement was in response to question unrelated to statutory language that Court was interpreting; and (2) floor statements supporting opposite interpretation were in record).

In addition, the context surrounding the floor statements in *Garcia* distinguishes it from this case. In *Garcia*, criminal defendants sought to use what they called "snippets" from floor debates to read into a criminal statute a requirement that essentially contradicted the committee report's explanation of the statutory language at issue. *Id.* at 76–77, 105 S.Ct. 479. Here, the floor statements do not contradict the committee report. Indeed, they explain it. To ignore such probative evidence is to ignore legislative intent. *See* Norman J. Singer, *2A Sutherland Statutory Construction* § 48.08 (5th ed. 1992) ("A colloquy between two House or Senate members cannot change the content of the conference report used to interpret the meaning of a statute, but it can be of assistance in interpreting the conference report.").

Plaintiff argues that adopting a broader interpretation of the phrase "readily identifiable with" will eat up that transition rule requirement entirely. Plaintiff's argument lacks merit. Commonwealth does not argue that *any and all* necessary property purchased pursuant to a supply contract should qualify the purchaser for an ITC. Rather, Commonwealth urges that the court read the "readily identifiable with" limitation to allow an ITC for property that is "innately or uniquely connect-ed or associated with a supply or service contract."

■ Although Commonwealth's proffered interpretation is useful to show that a broader reading of the language at issue would not necessarily swallow transition rule's limitations, the court need not adopt its interpretation to decide this case. The language of the statute and the legislative history—both committee report and Senate debate—indicate, in the power supply context, that generating equipment/property is "readily identifiable with" the written supply contract where the contract specifies (1) the primary energy source; and (2) the total generating capacity.[3]

Under this interpretation, Defendants were entitled to ITCs for all but one property purchase. The following purchases of generating property/equipment qualified for the ITC: (1) $3,780,900 replacement generator rotor (purchased in 1990 to replace original, 1968 rotor); (2) $16,919 replacement silica analyzers (which monitor the level of silica of the water injected into the boiler unit); (3) $51,003 replacement sequence events recorder system (to continuously monitor plant's activities, as required by Massachusetts law); (4) $363,193 replacement welded tubes (which reheat steam before reintroduction into the steam turbine); (5) $2,640,466 replacement burner panels (inside the boiler unit); (6) $146,936 replacement insulation (around control valve, flash tank, arch box and flue gas areas); (7) $419,249 replacement air preheater parts (to transfer heat turbine exhaust to air being introduced to the boiler unit); (8) $53,475 penthouse heating system (to prevent formation of corrosive sulfuric acid); (9) $138,000 replacement valves (for boiler start-up system in main power-

---

**3.** Both the committee report and the Senate colloquy indicate that the starting point of the analysis is the supply contract itself. The Senate colloquy further explains the committee report, showing that if the supply contract "specifies the primary energy source and ... total generating capacity of the turbines necessary to produce the contracted power," then "generating property/equipment" falls within the transition rule. 132 Cong.Rec. S8241 (daily ed. June 24, 1986).

house); and (10) $36,220 modification and parts replacement to boiler feed pump.[4]

The only property purchase that did not entitle Defendants to an ITC was a $221,334 purchase of barge mooring dolphins. Unlike the above pieces of equipment, which are intimately connected to the generation of power at the plant, the mooring dolphins are more tenuously tied to the generation of power. They are a means (not necessarily the only means) by which ships carrying fuel dock at the plant. *See* Stipulation of Facts, Exh. 10. The dolphins are not "readily identifiable with" the written power supply contract because they are not "generating equipment" or "generating property," the terms used in the senatorial colloquy. The purchase of the dolphins, therefore, did not entitle Defendants to an ITC.[5] As discussed in the accompanying order, the parties shall calculate the amount of refund attributable to the mooring dolphins, and Commonwealth shall repay Plaintiff that amount.

That two other district courts have reached different interpretations of the phrase "readily identifiable with" does not change this court's analysis.[6] A narrower interpretation such as the one proffered by Plaintiff and adopted by these two other courts would undermine the purpose behind the transition provision. The Reform Act of 1986 revoked the Investment Tax Credit ("ITC"). Both parties in this case agree that the purpose of the transition provision at issue was to "provide relief to taxpayers who had relied upon the ITC when entering contracts that required the purchase of tangible personal property after the date of the ITC's repeal [in 1986]." *Bell Atlantic Corp. v. United States,* 1998 WL 848122, at *2 (E.D.Pa.); *see also* Plaintiff's Response at 3; Defendants' Reply Memorandum at 1. To adopt an interpretation that required a supply contract to explicitly mention the property at issue would protect the reliance interests of a *very* limited group—i.e. those who were lucky enough to include property specifications in their contracts,[7] or who had the amazing foresight to predict (1) the repeal of the ITC; and (2) the passage of an ambiguous transition rule that would be narrowly interpreted to require explicit mention of the property.

This court's interpretation is supported by the statutory language, the committee report, and the highly probative senatorial colloquy. It strikes an appropriate balance by both protecting reliance interests, and giving meaning to the transition rule's "readily identifiable with" requirement.

AN ORDER WILL ISSUE.

## ORDER

For reasons set forth in the accompanying memorandum, the court hereby ALLOWS in part and DENIES in part the parties' cross motions for summary judgement (Docket 28, 30). The parties shall confer to calculate the amount of refund attributable to the barge mooring dolphin

---

4. These descriptions of the property come from Joint Exhibit 10 in the Stipulation of Facts.

5. To find otherwise would eviscerate the "readily identifiable with" requirement, as a taxpayer would be able to claim ITCs for any property that was "necessary" for the taxpayer to carry out its contractual obligations under the contract.

6. In *United States v. Zeigler Coal Holding Co.,* the district court looked to conference committee report, and concluded that "to be eligible for the ITC, the property must have been specifically described" in the supply contract.

934 F.Supp. 292, 294–95 (S.D.Ill.1996). In *Bell Atlantic Corp. v. United States,* the district court relied on *Zeigler Coal* to reach the same conclusion for ITCs claimed by a telephone company. No. 96–8657, 1998 WL 848122, at *9–10 (E.D.Pa. Dec. 4, 1998) ("In order to be eligible for the ITC, the property must have been specifically described.") (citing *Zeigler Coal*).

7. Luck would really be the issue, as it would be impossible for a power supplier to know what particular generating equipment would need repair and/or replacement years after the contract's formation.

tax credit, and Defendants shall pay Plaintiff that amount.

IT IS SO ORDERED.