**BELL ATLANTIC CORPORATION, Appellant,**

**v.**

**UNITED STATES of America.**

No. 99–1234.

United States Court of Appeals, Third Circuit.

Argued Jan. 13, 2000.

Filed Aug. 17, 2000.

Thomas E. Zemaitis, Gordon R. Downing, Pepper Hamilton LLP, Philadelphia, PA, Thomas P. Marinis, Jr., John D. Taurman, Thomas S. Leatherbury, (argued), Sarah A. Duckers, Debra J. Duncan, H. Mallory, Caldwell, Vinson & Elkins L.L.P., Houston, TX, Attorneys for Appellant.

Loretta C. Argrett, Assistant Attorney General, Bruce R. Ellisen, Thomas J. Sawyer, (argued), Attorneys Tax Division, Department of Justice, Washington, DC, Michael R. Stiles, United States Attorney of Counsel, Attorneys for Appellee.

Before ALITO, BARRY, and ALDISERT, Circuit Judges.

### OPINION OF THE COURT

ALITO, Circuit Judge:

This appeal concerns a transition rule for capital investment tax credits ("ITC") contained in a provision of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085 (1986). Bell Atlantic Corporation seeks a $77 million income tax refund un-

der this rule, and it appeals the District Court's decision that it was not entitled to such a refund. We affirm.

## I.

Prior to the enactment of the Tax Reform Act, the Internal Revenue Code provided that qualifying taxpayers were entitled to an income tax credit for qualified investments in certain tangible property. *See* 26 U.S.C. § 38 (1985). The Tax Reform Act changed this regime. The Act reduced corporate income tax rates, but it also eliminated many deductions, exclusions, and credits. Among the credits that were eliminated were investment tax credits on property brought into service after December 31, 1985. The Act included transitional rules that ameliorated this change to some extent. *See* Tax Reform Act §§ 203–04.

One of these transitional rules is the "supply or service contract" rule, which allows an investment tax credit for otherwise-qualified property if that property is "readily identifiable with and necessary to carry out a written supply or service contract, . . . which was binding on [December 31, 1985]." Tax Reform Act § 204(a)(3). Under this rule, a taxpayer could still claim an ITC if it had agreed to perform some service that required it to purchase otherwise-qualified property and if that service contract was binding as of the end of 1985. Thus, for example, if Bell Atlantic had agreed to wire a new residential development for telephone services, pursuant to a written contract signed at the end of 1985, and if Bell Atlantic then had to purchase telephone poles as part of the contracted service, that purchase might qualify for an ITC under the service contract transitional rule.

## II.

### A.

Bell Atlantic claims that it is entitled to ITC for hundreds of millions of dollars of property put into service after 1985, because it purchased the property "in order to satisfy its written obligations to provide telecommunications services." *See* Appellant Br. at 3. In support of its claim, Bell Atlantic asserts that its utility franchises, tariffs, contracts with other local telephone companies, and contracts with long distance carriers are "written . . . service contract[s]" within the meaning of the Act. Bell Atlantic claims that its franchises and tariffs are contracts because the state offered "the right to provide telephone service" and "in exchange . . . Bell Atlantic . . . agreed to undertake specified service obligations." *Id.* at 27–28. Bell Atlantic then asserts that much of the property purchased in the course of its telephone service business is "readily identifiable with and necessary to carry out" these franchises, tariffs, and contracts and, therefore, is eligible for ITC under the service contract transitional rule.

Bell Atlantic's utility franchises govern Bell Atlantic's relationships with the various authorities that regulate it. Franchises usually encompass rate regulation, utility service obligations, and the standards that must be met before a new industry entrant can begin providing telephone service. Tariffs are maintained by Bell Atlantic with the various state public utility commissions. The tariffs govern Bell Atlantic's relationships with its customers and detail the parties' mutual obligations under the applicable franchises. By their own terms, tariffs often become the contract between the utility and the customer once service begins. *See, e.g.,* App. at 1443 (Maryland tariff). Finally, in order to provide uninterrupted service to its customers, Bell Atlantic contracts with other telephone companies that provide local service in its service areas and with the telephone companies that provide long distance service to Bell Atlantic customers.

Bell Atlantic's tariffs, franchises, and contracts with other telephone companies

all incorporate service quality standards.[1] Bell Atlantic claims ITC for property purchased to meet the service quality standards that were incorporated in Bell Atlantic's franchises, tariffs, and other contracts because the service quality standards in the contracts "dictate what property is 'readily identifiable with and necessary to carry out' the contracts." Appellant Br. at 13. This property included new telephone lines, telephone poles, and many other capital investments. Because "a telephone network is constantly both wearing out and growing," *id.* at 16, it is beyond doubt that in order to provide telephone service at the level required by the applicable service quality standards, Bell Atlantic had to purchase a great deal of property.

When Bell Atlantic found that it was in danger of failing to meet a service quality standard, it "engaged in an extensive and detailed planning process ... to identify ... the property necessary to correct that situation." *Id.* at 19. All of the estimates, budgets, projections, forecasts, and other documents generated by Bell Atlantic's internal planning processes went into "estimate files." Bell Atlantic asserts that the estimate files disclose what property was "readily identifiable with and necessary to carry out" its contracts and that the estimate files are the link that makes this property eligible for ITC, because these files "contain all of the information necessary to tie a project to a contractual obligation and to explain why the property was necessary to satisfy that obligation." *Id.* at 21. Bell Atlantic thus claims ITC for all the property referred to in the estimate files in the record.

### B.

The government asserts that Bell Atlantic's franchises and tariffs are not con-

tracts. It relies on *National R.R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co.*, 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985), in which the Supreme Court re-affirmed the principle that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Id.* at 465–66, 105 S.Ct. 1441 (quotation marks omitted). As Bell Atlantic has not shown that the legislatures in Bell Atlantic's service area have given a clear indication that they intended to be contractually bound, the government maintains that Bell Atlantic's franchises and tariffs are not contracts. In addition, the government notes that while Bell Atlantic's tariffs often state that they represent the contract between Bell Atlantic and its customers, no written contract passes between the two parties. The tariffs are also modified on a regular basis by the state utility commissioners without the consent of Bell Atlantic or its customers. For this reason, the government contends that Bell Atlantic's tariffs are more like regulations than contracts.

As a narrower ground for affirmance, the government asserts that Bell Atlantic's franchises and tariffs are not "written service contracts" for the purposes of the Tax Reform Act. The government contends that because the Tax Reform Act eliminated investment tax credits, a taxpayer may get different treatment only if it is clearly entitled to it, as "provisions granting special tax exemptions are to be strictly construed." *Helvering v. Northwest Steel Rolling Mills, Inc.*, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29 (1940). Thus, if there is any doubt whether Bell Atlantic's

---

**1.** By way of example, the State of New Jersey requires that 75% of regular service installations must be completed within five working days and that 95% of local calls must be completed without encountering a busy circuit. *See* N.J. Admin. Code tit. 14 § 10– 1.10(b) (2000). Some of Bell Atlantic's contracts with other telephone companies require that Bell Atlantic "maintain and operate its system so as to provide adequate facilities for the provision of services." App. at 961.

franchises and tariffs qualify as "written service contracts" under the special tax exemption available to those who put property in service in order to carry out eligible "written service contracts," that doubt must be resolved against the taxpayer.

To the extent that Bell Atlantic relies on the favorable treatment of the cable television industry under the service contract transitional rule, the government argues that the favorable treatment of the cable television industry and of other taxpayers under the rule undermines Bell Atlantic's case because it illustrates the only manner in which favorable tax treatment, such as special exemptions and transitional relief, may be gained. In the Conference Report on the Tax Reform Act, H.R. Conf. Rep. No. 99–841 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075 (hereinafter Conf. Rep.), the Committee stated: "The conferees wish to clarify that this rule [the service contract transitional rule] applies to cable television franchise agreements." Conf. Rep. at 4148. Some other taxpayers also managed to secure specific exemptions for themselves in the Act itself. *See, e.g.*, Tax Reform Act § 204(a)(6) (granting certain exemptions to "any interstate natural gas pipeline" that had certain construction applications on file with the Federal Energy Regulatory Commission and that had one of its terminal points near Bakersfield, California). Thus, the government asserts that the absence of any such reference to Bell Atlantic or to the telephone service industry suggests that Bell Atlantic is not eligible for a special exemption to the repeal of the investment tax credit.

The government also relies on the Conference Report to illuminate the meaning of the term "written service contract." The Conference Report gives more specific guidance as to what qualifies as a "written supply or service contract." According to the report, the transitional rule "applies only to contracts in which the construction, reconstruction, erection, or acquisition of property is itself the subject matter of the contract." Conf. Rep. at 4143. This is true whether an exemption is claimed under the general transitional rule for purchases or under the service contract transitional rule. *See id.* at 4148. While the franchises, tariffs, and other agreements contemplate service quality standards, they do not concern "the construction, reconstruction, erection, or acquisition of property." The government therefore contends that Bell Atlantic's franchises, tariffs, and other agreements are not contracts under the Tax Reform Act.

Even if Bell Atlantic's franchises, tariffs, and other contracts are "written service contracts" within the meaning of the term in the Tax Reform Act, the government asserts that no property was "readily identifiable with and necessary to carry out" the alleged contracts. Again, the government relies on the Conference Report: "Th[e] transitional rule is applicable only where the specifications and amount of the property are readily ascertainable from the terms of the contract, or from related documents." Conf. Rep. at 4148. Bell Atlantic asserts that the property is "readily ascertainable" from the estimate files. The government argues that the estimate files are not "related" to the "contracts" because they were only "internal budgeting documents," that were not prepared contemporaneously with the "contracts" and were not provided to the other contracting party. Appellee Br. at 58. Thus, the government's position is that Bell Atlantic is not entitled to investment tax credit.

### III.

■ We do not find it necessary to decide whether Bell Atlantic's tariffs, franchises, and contracts with other telephone companies are "written service contracts" within the meaning of the Act. Instead, we focus on the question whether any property was "readily identifiable with and necessary to carry out" these "contracts." Bell Atlantic's franchises, tariffs, and other contracts contain service quality standards that regulate telephone service, impose

conditions on service and set service goals. Whenever Bell Atlantic was required to put new property into service to meet a service quality standard, Bell Atlantic constructed an estimate file to document the purchase itself and the need for the new property under the pertinent service quality standard. Bell Atlantic asserts that these estimate files allow us to determine what property is "readily identifiable with and necessary to carry out" the contracts. We disagree.

The Tax Reform Act imposes two conditions that must be met before property is eligible for ITC. The property must be both "necessary to carry out" the service contract and "readily identifiable with" it. It cannot be determined from the terms of any of the tariffs, franchises, or other contracts that the property for which Bell Atlantic claims ITC is "readily identifiable with" the tariffs, franchises, or contracts. This is because these alleged "contracts" speak only of service quality standards, never mentioning property of any sort. The property, therefore, must be "readily identifiable with" the contracts by some other means. Bell Atlantic asserts that the estimate files bridge the gap. However, the tariffs, franchises, and contracts do not direct the preparation of estimate files; nor do they direct what they should contain.

Bell Atlantic asserts that the estimate files show what property was "readily identifiable with" the contracts because Bell Atlantic had to undertake the purchases detailed in the estimate files in order to meet the service quality standards in the contracts. The District Court held that this link is "too attenuated," Dist. Ct. Op. at 23, and we agree. In addition, we note that it was undisputed that the estimate files did not have a binding effect on anyone. As the District Court observed, the estimate files were prepared for internal forecasting, planning and budgeting. They were not prepared contemporaneously with the contracts, and they were not provided to any party to the alleged contracts. *Id.* at 21–22. The question then becomes whether Bell Atlantic's estimate files in and of themselves make the property "readily identifiable with and necessary to carry out" the tariffs, franchises, and contracts.

We believe that Bell Atlantic's argument is inconsistent with Congress's choice of the term "readily identifiable." 26 U.S.C. § 204(a)(3). Obviously Congress did not want to extend ITC to all property that was identifiable and necessary to carry out a service contract. Instead, Congress demanded that the property be "readily" identifiable with the contract. "Readily" means "promptly," "quickly," or "easily." *The Random House Dictionary of the English Language* 1195 (Jess Stein ed., 1967). Although it is not possible as a general matter to draw a bright line between property that is "readily identifiable" with a service contract and property that is merely identifiable with a service contract, we agree with the government and the District Court that Bell Atlantic's estimate files cannot meet the "readily identifiable" standard.

The Conference Report regarding the supply or service contract transition rule buttresses this conclusion. The Report states that the "transitional rule is applicable only where the specifications and amount of the property are readily ascertainable from the terms of the contract, or from *related documents*." Conf. Rep. at 4148 (emphasis added). Here, the relationship between the tariffs, franchises, and contracts, on the one hand, and the estimate files, on the other, is, as the District Court aptly put it, "attenuated," at best.

In addition, we believe that Bell Atlantic's argument is difficult to square with the rule that a statute should be construed, if possible, so that each part is given effect and no part is rendered inoperative or superfluous. *See United States v. Higgins*, 128 F.3d 138, 142 (3d Cir.1997). The statute at issue here imposes two distinct requirements for ITC: the property must

be both "necessary to carry out" the contracts and also "readily identifiable with" the contracts. If we can, we are bound to avoid an interpretation of this statute that renders one of the two statutory requirements superfluous.

The estimate files were prepared by Bell Atlantic, and we assume that they detail what property was needed to meet the service quality standards in the contracts, but this only demonstrates why the property was "necessary to carry out" the contracts. Bell Atlantic has described the estimate file process as "engag[ing] in an extensive and detailed planning process . . . to identify . . . the property necessary to correct that situation." Appellant Br. at 19. This merely tells us that the property was necessary to meet the applicable service quality standard. If determining what property was necessary to carry out the contract also necessarily had the effect under the statute of making that property identifiable with the contract, the "readily identifiable with" language of the statute would have no operative effect.

■ We note that the very use of a two-prong test in the statute presumes that there will be property that fails to qualify for ITC under the transitional rule because it meets only one of the two requirements in the statute. Some property will be "necessary to carry out" the contract but not "readily identifiable with" it—and vice versa. Under Bell Atlantic's proposed construction of the statutory test, it is doubtful that any property that was "necessary to carry out" the contract would ever fail the "readily identifiable with" prong. When property is necessary to carry out a contract, a taxpayer could almost always generate some sort of document detailing this relationship. The taxpayer could then point to this document to demonstrate that the property was "readily identifiable with" the contract. As this result would render superfluous the language in the statute that the property for which a taxpayer claims ITC must be "readily identifiable with" a written service contract binding as of December 31, 1995, we hold that property cannot be shown to be "readily identifiable with" a written service contract by means of internally generated documents, such as the estimate files in this case, that were not prepared contemporaneously with the contract, that had no binding effect on anyone, and that were not provided to the other contracting party. Because Bell Atlantic has not met its burden of showing that the property for which it claims ITC was readily identifiable with the contracts in question, the District Court did not err in denying Bell Atlantic's claim for investment tax credit.

This result is supported by the decisions of other courts that have examined the statute. In *United States v. Commonwealth Energy Sys.*, 49 F.Supp.2d 57 (D.Mass.1999), the court found in favor of the taxpayer's claim for a refund under Tax Reform Act § 204(a)(3). Commonwealth Energy claimed ITC for power generating equipment purchased pursuant to a contract under which it had agreed to supply power. The contract specifically covered the building of a new steam plant to provide 560 megawatts. *See Commonwealth Energy*, 49 F.Supp.2d at 59. Because the amount of power was specified in the contract itself, the District Court held that "the specifications . . . of the property [were] readily ascertainable from the terms of the contract." Conf. Rep. at 4148. Commonwealth Energy was granted ITC for a replacement generator rotor, replacement burner panels, and various other items, which were "intimately connected to the generation of power at the plant." *Commonwealth Energy*, 49 F.Supp.2d at 60–61. Bell Atlantic's situation is not analogous to this case because in *Commonwealth Energy* the power supply contract itself provided a measure by the which the power plant property could be identified, namely, the wattage requirement, whereas the service quality standards in Bell Atlantic's contracts cannot identify any property without resort to the estimate files.

In *United States v. Zeigler Coal Holding Co.*, 934 F.Supp. 292 (S.D.Ill.1996), the District Court held that it would not allow ITC unless the property had been "specifically described" in the contract or related documents and that to hold otherwise would mean "that the transition rule exception would swallow the rule eliminating the ITC." *Id.* at 295. In *Southern Multi-Media Communications, Inc. v. Commissioner*, 113 T.C. 412, 1999 WL 1120404 (T.C.1999), a cable television company claimed ITC for property used to make extensive improvements to some of its systems and to extend its lines in some of its service areas. *See id.* at *1–2. Even though the company's franchise required that the system be "maintained in accordance with the highest accepted standards of the industry," *id.* at *2, the Court held that the improvements and line extensions were not "necessary to carry out" the franchise because the company was not "specifically required" to undertake the improvements, *id.* at *2–3.

Our holding today that ITC property must be "readily identifiable with" a contract by some means other than an internally generated document is perfectly consonant with a requirement that the ITC property must be "specifically required" or "specifically described." As we hold that no property was "readily identifiable" with Bell Atlantic's franchises, tariffs, and other contracts with telephone companies, we reject Bell Atlantic's claim for investment tax credit.

IV.

For the reasons explained above, the judgment of the District Court is affirmed.