T.C. Memo. 2000-270


UNITED STATES TAX COURT


NEWHOUSE BROADCASTING CORPORATION AND
SUBSIDIARIES, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19448-97, 23753-97,     Filed August 25, 2000.
            24489-97,  6210-98.


        P and R have both moved for partial summary
judgment on the issue of whether property used in
extending and maintaining a cable television system
pursuant to a cable television franchise agreement
qualifies for investment tax credit under the "supply
or service" transition rule of sec. 204(a)(3) of the
Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085,
2149.
        <u>Held</u>: (1) Property to be used by P's subsidiary M
in extending and maintaining the cable television
system is described in sufficient detail in the

_____

[1] Cases of the following petitioners are consolidated herewith:
Advance Publications, Inc., and Subsidiaries, docket No. 23753-
97; Cox Enterprises, Inc., and Subsidiaries, docket No. 24489-97;
and Chronicle Publishing Co., Richard T. Thieriot, Tax Matters
Person, docket No. 6210-98.

franchise agreement to permit a determination of whether property actually used by M for that purpose may be considered "readily identifiable with" such agreement within the meaning of sec. 204(a)(3), id., and (2) there are genuine issues of material fact in determining whether all the property actually used is "readily identifiable with and necessary to carry out" the franchise agreement as required by sec. 204(a)(3), id. Both motions for partial summary judgment shall be denied.

Bernard J. Long, Jr., David E. Mills, and James R. Saxenian, for petitioner.

Gary D. Kallevang and William J. Gregg, for respondent.

MEMORANDUM OPINION

HALPERN, Judge: Both petitioner Newhouse Broadcasting Corp. (petitioner) and respondent have moved for partial summary judgment. Each party objects to the other's motion. The issue common to those motions (petitioner's motion, respondent's motion, or, together, the motions) is whether MetroVision of Livonia, Inc. (MetroVision), a wholly owned subsidiary of petitioner's, is entitled to an investment tax credit (ITC) on account of certain property placed in service by it during its taxable years ended July 31, 1989 and 1990 (the 1989 and 1990 taxable years or the audit years). The property in question relates to a cable television franchise awarded to MetroVision in 1983. The motions require us to interpret the supply or service

transition rule (supply or service transition rule) of section 204(a)(3) of the Tax Reform Act of 1986 (TRA of 1986 or the Act), Pub. L. 99-514, 100 Stat. 2085, 2149, to determine whether MetroVision properly claimed the ITC (transition ITC). We shall deny both motions. Our reasons follow.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

I. Introduction

Approximately 186 cable franchise agreements are involved in petitioner's case and about 200 similar agreements are involved in the cases consolidated with petitioner's case. Although the motions relate to a single cable television franchise agreement, the issue presented is common to all of the cable franchises and systems in dispute. Therefore, resolution of the issue in this case will facilitate resolution of the same issue as it arises in the other cases.

II. Background

A. Introduction

For purposes of the motions, the parties have stipulated certain facts. We accept the stipulated facts as being true for purposes of deciding the motions. The stipulation of facts, with attached documents, is incorporated herein by this reference.

The parties have also filed various memoranda of law, some with attached affidavits, and other documents. The following recitation of facts is drawn primarily from the stipulation of facts. Certain other facts (which facts we deem noncontroversial) are included in that recitation. In section II.C., infra, we summarize pertinent parts of the various affidavits submitted by the parties. Those affidavits are relevant principally with respect to petitioner's motion. We believe that those affidavits support our conclusion that, with respect to the requirements of the supply or service transition rule, there are genuine issues of fact that foreclose summary judgment for petitioner.

B. Facts Pertaining to the MetroVision Television Franchise

1. Granting of the Cable Franchise to MetroVision

On August 23, 1982, the council of the City of Livonia, Michigan, enacted Ordinance No. 1651 (Ordinance 1651). Ordinance 1651 contains the procedures pursuant to which the City of Livonia issued a request for proposals (request for proposals) with respect to the construction of a cable television system within the city. In response to the request for proposals, MetroVision submitted a franchise application, dated December 13, 1982 (the MetroVision application). On May 18, 1983, the City of Livonia enacted Ordinance 1685, which awarded a 15-year nonexclusive cable television franchise to MetroVision (the

Livonia Franchise Agreement or franchise agreement).  On June 1, 1983, MetroVision sent a letter to the City of Livonia accepting the cable television franchise (MetroVision letter of acceptance).  The parties have stipulated that, for purposes of the motions, the Livonia Franchise Agreement was, as of December 31, 1985, a binding written contract between MetroVision and the City of Livonia.

### 2. Relevant Terms of the Franchise Agreement

By the franchise agreement, MetroVision was awarded

> the right to construct, operate, and maintain a cable television system within the corporate boundaries of the City of Livonia, and to construct, operate and maintain * * * all necessary poles, towers, anchors, wires, cables, electronic conductors, underground conduits, manholes, terminals and other structures and appurtenances integral to this cable television system.[2]

The franchise agreement defines the term "cable television system" as follows:

> A system of coaxial cables or other electrical conductors and equipment used to receive or originate or receive television radio signals and to transmit them via cable to subscribers for a fixed or variable fee, including the origination, receipt, transmission, and distribution of voices, sound signals, pictures, visual images, digital signals, telemetry, or any other type of closed circuit transmission by means of

---

[2]  The franchise agreement defines the term "Franchise" as follows:  "The rights of grantee [MetroVision] to construct and operate a cable television system in the City, subject to the City Charter, the Cable Television Regulatory Ordinance, this ordinance and all other applicable ordinances of the City, and the franchise agreement."

electrical impulses; and as defined by the FCC Rules and Regulations (47 CFR 76.5).

In consideration of the award of the franchise, MetroVision agreed to pay the City of Livonia a fee of 5 percent of MetroVision's annual gross revenues generated by the cable television system.  The term of the franchise is 15 years from the date of execution of the franchise agreement, subject to renewal, and the franchise area extends "throughout the present corporate limits of the City of Livonia and to any area * * * annexed to the City during the term of this franchise."

In addition to meeting the requirements of the Livonia Franchise Agreement itself, the franchise agreement requires MetroVision to "provide all services and meet all requirements of" (1) the request for proposals, (2) Ordinance 1651, (3) the MetroVision application, and (4) "all other written and oral representations made by the Grantee".  (Hereafter, those documents and representations, along with the franchise agreement, are referred to collectively as the pre-1986 documents.)

Ordinance 1651 requires:

[a]ll facilities and equipment * * * shall be constructed and maintained at a state-of-the-art level in accordance with applicable requirements and specifications, including, but not limited to, those of the National Electrical Code, the rules and regulations of the Federal Communications Commission, and all other pertinent ordinances and codes of the City of Livonia.

The term "state-of-the-art equipment" is defined by the franchise agreement to encompass "[a]ny components or equipment accepted and used by leaders in the industry and considered to be the most modern and advanced equipment commercially available." Consistent with the requirement to install state-of-the-art equipment, the franchise agreement also requires MetroVision to "meet or exceed all the material construction and service requirements set out in * * * [petitioner's] franchise applications." (Emphasis added.)

Exhibits A through F attached to the Livonia Franchise Agreement contain detailed requirements concerning cable system design and performance (exhibit A), the system construction schedule (exhibit B), system services and programming (exhibit C), support for public access and local programming (exhibit D), the initial schedule of rates and charges for all services to be provided by MetroVision (exhibit E), and the construction procedures for installation of the system (exhibit F).

Various subsections of exhibit A list the required capacities, capabilities, and technical standards of the equipment and facilities to be installed. For example, MetroVision is required to build a cable system that, at a minimum, delivers signals at frequencies up to 440 MHz (60 channel capacity); has satellite earth stations capable of

receiving signals from all operational communications satellites that generally carry programs available to cable systems; provides compatibility for various interactive residential services such as security alarm monitoring, home shopping, video games, and one-way or interactive education; and provides certain specified cablecasting facilities for use by the City of Livonia and its residents. The equipment for the cablecasting facilities is required to be "as indicated in * * * [MetroVision's] franchise application" although "[e]quivalent or superior items may be provided, with Grantor concurrence." Exhibit C requires MetroVision to broadcast certain television signals, including 10 Detroit area television broadcast stations, 3 distant television broadcast stations (WGN (Chicago), WOR (New York), and WTBS (Atlanta)), 5 other specified stations, 20 video programming services distributed by communications satellite (e.g., CNN, ESPN, C-Span, The Weather Channel), 10 alphanumeric programming services (e.g., AP News cable, Dow-Jones News Service), 12 local channels for community and governmental use, 2 local origination programming services, and certain pay TV services (Bravo and Home Theater Network).

The MetroVision application also contains schedules listing (1) the types of equipment (often by manufacturer and anticipated unit cost) that would be needed, (2) the technical standards for the equipment, both in terms of the Federal Communications

Commission (FCC) requirements and, where they exceed the FCC requirements, in terms of MetroVision's own requirements, and (3) channel capacity and system capability.  One of the volumes comprising the MetroVision application details the proposed maintenance procedures to be employed by MetroVision.  Volume II, section VI of the MetroVision application, entitled "System Design", contains detailed descriptions of the equipment to be used in installing and maintaining the Livonia cable system. Thus, one subsection, entitled "Summary of Proposed System Distribution Equipment List", lists equipment by manufacturer and model number (e.g., "Trunk Amplifiers -- Scientific Atlanta 6500/440 series"; "Power Supplies -- Electro model SV-L-4-60 BC (Dual) with status monitoring and stand by power").  Another subsection, entitled "Satellite Earth Stations", describes the "major hardware elements of the earth terminal installation" for satellite reception as consisting of "TVRO Antenna System - RSI 'Torus', Model 450 TC", and contains a detailed description of the capabilities and features of this antenna system, which is to be installed at two locations.  A third example of this kind of equipment detail is provided by a subsection describing "headend equipment" and "subscriber premises equipment to be installed initially for home interactive services."  Here, again, the equipment is described by manufacturer and model number.

3.  MetroVision's Activities Pursuant to the Franchise

MetroVision commenced construction of the Livonia cable system in 1984.  By 1985, construction was substantially complete.  During the 1988-90 period, the construction activity undertaken by MetroVision was to (1) extend the cable system into newly constructed subdivisions, (2) deliver service to new customers in existing service areas, and (3) replace worn out, broken, or otherwise obsolete cable television equipment.  Respondent does not dispute, and we find, that those activities were required by and undertaken pursuant to the terms of the Livonia Franchise Agreement.  No significant changes to the system, in terms of the number of channels or the channel selection, were undertaken during the 1988-90 period.

Petitioner has been unable to locate the invoices, purchase orders, or any other list of the items of property placed in service during the audit years for which it is claiming transition ITC (the subject property).  As a result, petitioner has been unable to demonstrate that the subject property is property described in the Livonia Franchise Agreement. The parties have stipulated, however, as to the authenticity of certain charts of accounts and general ledger materials pertaining to MetroVision which show, by dollar amount and general category of expenditure (e.g., "Distribution System", "Head End Equipment", "Local Production Equipment", "Traps &

Decoders", "Technical Equipment", etc.), MetroVision's expenditures during the audit years for property placed in service in expanding and maintaining the Livonia cable television system.[3] The various categories encompass types of equipment common to cable television systems generally and to the Livonia system in particular.

During the 1989 and 1990 taxable years, the number of miles of plant increased from 421 to 430 and the number of subscribers from 23,337 to 25,497.

C. <u>Affidavits</u>

Petitioner submitted affidavits of Thomas Bjorklund who, during the audit years and until he left petitioner's employment in 1996, was responsible for the installation and maintenance of the Livonia cable system, and Edward P. Kearse, an attorney who, for more than 25 years, "specialized in the administration and law affecting cable television systems and cable franchise agreements."

Respondent submitted an affidavit by Charles Gramlich, a self-employed cable television and telecommunications consultant who provides consulting services to city and county governmental cable franchising authorities.

---

[3] By stipulating as to authenticity, respondent has not stipulated as to the truth of the material contained in the general ledger accounts except for purposes of respondent's motion for summary judgment.

By his affidavit, Mr. Bjorklund declares:  From the date of its organization in 1983, MetroVision has been engaged solely in the business of providing cable television service to the residents of the City of Livonia.  The subject property was installed in compliance with specific provisions of the Livonia Franchise Agreement.  In some instances, MetroVision installed updated versions of equipment illustrated in MetroVision's application, which "had the incidental effect of increasing by two channels the potential capacity of the sixty-two channel Livonia cable television system."

By his affidavit, Mr. Kearse describes cable television franchise agreements generally and declares that the core provisions of the Livonia Franchise Agreement are consistent with the terms of such agreements.  By his affidavit, respondent's affiant, Mr. Gramlich, acknowledges that the Livonia Franchise Agreement "contains fairly specific details as to such things as performance standards, programming, and installation."  He rejects, however, Mr. Kearse's declaration that a cable franchise generally carries with it "the obligation to incorporate new 'state of the art' technology in the facilities and to extend and improve service over the life of the franchise", and he concludes that the Livonia Franchise Agreement contains no such obligation. In reaching this conclusion, Mr. Gramlich apparently ignores the state-of-the-art requirement contained in Ordinance 1651.

Mr. Gramlich also disagrees with petitioner's statement that all of the subject property was placed in service solely in order to comply with the terms of the Livonia Franchise Agreement. That disagreement appears to be based upon his observation that, generally, a cable television operator makes all decisions for "business reasons", and that, if the business reasons conflict with a requirement of the franchise agreement, "the cable operator will seek relief from the franchising authority."

III. Discussion

A. Introduction

As stated, we shall deny both motions. We shall deny each motion for a different reason. We shall deny respondent's motion because we disagree with respondent's determination that the pre-1986 documents fail to contain sufficient descriptions to determine whether the subject property is "readily identifiable with" such documents. See infra sec. III.E. We shall deny petitioner's motion because there are genuine issues of fact as to whether all of the subject property is "readily identifiable with and necessary to carry out" the Livonia Franchise Agreement. See id.

B. Statutory Provisions

Prior to 1986, an investment tax credit was available pursuant to sections 38(b), 46, 48, for investments in certain types of tangible property placed in service during the taxable

year (qualifying property). The amount of the credit depended upon the useful life of the qualifying property. The maximum credit was 10 percent of the cost of qualifying property with a useful life of 7 years or more. The credit was repealed by section 211 of TRA of 1986, 100 Stat. 2166, which added section 49[4] to the Internal Revenue Code. Section 49(a), made the investment credit inapplicable to property placed in service after December 31, 1985. Because TRA of 1986 did not become law until October 22, 1986, the repeal of the investment credit was necessarily retroactive. Therefore, the Act contains a number of transitional rules to provide relief for taxpayers who may have committed to post-1985 investments in qualifying property in reliance on the availability of the credit.[5] Pursuant to section 49(b)(1), the section 49(a) repeal of the credit does not apply

---

[4] Sec. 11813 of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388-536, repealed sec. 49 and replaced it with existing sec. 49 (at-risk rules).

[5] See H. Rept. 99-426 at 146 (1985), 1986-3 C.B. (Vol. 2) 1, 146, in which the House Ways and Means Committee makes the following observation with respect to the repeal of the then existing cost recovery rules, including the investment tax credit:

> The committee is aware that commitments have already been made on the basis of present law capital cost recovery rules. The committee bill provides for equitable transition rules in such cases, which are estimated to cover more than 50 percent of the new personal property to be placed in service in the first year the bill is effective.

to "transition property."  In relevant part, section 49(e)(1)

defines "transition property" as:

> any property placed in service after December 31, 1985,
> and to which the amendments made by section 201 of the
> Tax Reform Act of 1986 do not apply, except that in
> making such determination--
>
>     \*     \*     \*     \*     \*     \*
>
>   (B) [section] * * * 204(a)(3) of such Act shall be
> applied by substituting "December 31, 1985" for
> "March 1, 1986,"[6]

Section 204(a)(3) of the Act provides the supply or service

transition rule, upon which petitioner relies.  As modified by

section 49(e)(1)(B), section 204(a)(3) of the Act (section

204(a)(3)) provides that "section 201 shall not apply to any

property which is readily identifiable with and necessary to

carry out a written supply or service contract, or agreement to

lease, which was binding on * * * [December 31, 1985]."

Under section 203(b)(2)(A) of the Act, section 204(a)

transition property with a useful life of 20 years or more may be

placed in service before January 1, 1991, and still qualify for

the section 204(a) transition rules.  Section 203(b)(2)(C)(ii) of

the Act provides that "property described in section 204(a) shall

---

6  Sec. 201 of the Tax Reform Act of 1986, Pub. L. 99-514, 100
Stat. 2121, modified the accelerated cost recovery system and
sec. 203 of the Act provided that such modifications were
generally effective for assets placed in service after Dec. 31,
1986.  Secs. 203 and 204 of the Act provided a number of
transition rules postponing the effective date of the sec. 201
changes.

be treated as having a class life of 20 years".  Those section 203(b)(2) placed-in-service rules apply without modification in determining eligibility for transition ITC, provided that the property has a class life of at least 7 years.[7]  Petitioner states (and respondent does not dispute) that all of the subject property has a class life of at least 7 years.  Therefore, assuming the subject property qualifies as transition property, there is no question that it was timely placed in service so as to be eligible for transition ITC.

C.  Summary Judgment

A summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law."  Rule 121(b).  "A partial summary adjudication may be made which does not dispose

---

[7]  See sec. 49(e)(1)(C) which provides:

   (C) in the case of transition property with a class
life of less than 7 years--

   (i) section 203(b)(2) of such Act shall apply, and

   (ii) in the case of property with a class life--

      (I) of less than 5 years, the applicable date
      shall be July 1, 1986, and

      (II) at least 5 years, but less than 7 years, the
      applicable date shall be January 1, 1987, * * *

of the issues in the case." <u>Id.</u> Summary judgment is a device used to expedite litigation and is intended to avoid unnecessary and expensive trials of phantom factual questions. See, e.g., <u>Espinoza v. Commissioner</u>, 78 T.C. 412, 415-416 (1982). It is not, however, a substitute for a trial in that disputes over factual issues are not to be resolved in such proceedings. See <u>id.</u> The party moving for summary judgment has the burden of showing the absence of a genuine issue as to any material fact. See <u>id.</u>

    D.  <u>Summary of the Arguments of the Parties</u>

        1.  <u>Petitioner's Arguments</u>

With respect to the requirement of the supply or service transition rule that property be "readily identifiable" with a written supply or service contract, petitioner cites dictionary definitions of the terms "readily", "identifiable", and "identify" to support its argument that "for property to be 'readily identifiable' with a contract simply means that one could, with a fair degree of ease, link such property to the contract". Petitioner states that such "linkage is established by Mr. Bjorklund, who has testified that MetroVision of Livonia placed in service the subject property solely in order to provide cable television service within the City of Livonia, pursuant to its obligations under the Livonia Franchise Agreement."

With respect to the requirement of the supply or service transition rule that property be "necessary" to carry out a written supply or service contract, petitioner argues:

> Expenditures incurred by a cable operator acquiring property placed in service to provide cable television service under the terms of a cable television franchise agreement are normal, appropriate expenses and hence 'necessary' as that term is understood in the context of business expenditures.

In support of that argument, petitioner cites Commissioner v. Heininger, 320 U.S. 467 (1943), and Carbine v. Commissioner, 83 T.C. 356 (1984), affd. 777 F.2d 662 (11th Cir. 1985), cases dealing with the requirement that business or profit seeking related expenses be "ordinary and necessary". Secs. 162(a), 212. Petitioner relies on Messrs. Bjorklund's and Kearse's affidavits to establish that the expenses in question are normal and appropriate expenses to provide cable television service.

## 2. Respondent's Arguments

In support of respondent's motion, respondent argues that property is "readily identifiable with and necessary to carry out a written supply or service contract" only if it is "specifically described" in the contract and/or related (pre-1986) documents. Respondent argues that, because the subject property was not "mentioned, described, referred to, particularized, or identified in any way * * * as to quantity, description, cost, vendor, model number, purpose or any other characteristics" in either the contract or in any pre-1986 related document, such property

cannot qualify under the transition rule for supply or service contracts.

In support of his argument, respondent relies on H. Conf. Rept. 99-841 at 60 (1986), 1986-3 C.B. (Vol. 4) at 60.  H. Conf. Rept. 99-841 is the report of the committee of conference (conference report) accompanying H.R. 3838, 99th Cong. 1st Sess. (1985), which, when enacted, became the TRA of 1986.  Respondent relies primarily upon the following language in the conference report describing the supply or service transition rule in support of his argument that the property must be specifically identified in pre-1986 documents:  "This transitional rule is applicable only where the specifications and amount of the property are readily ascertainable from the terms of the contract, or from related documents."  H. Conf. Rept. 99-841, supra at 60, 1986-3 C.B. at 60.  Respondent's position appears to be that the description in the franchise agreement of property to be used in implementing such agreement is not sufficiently detailed to meet that test.  Respondent also appears to be arguing, that because of its inability to identify in any way the subject property, petitioner cannot sustain its burden of proving that such property is "readily identifiable with" (i.e., "specifically described" in) the franchise agreement.

In opposition to petitioner's motion, respondent argues that there are genuine issues of material fact as to whether all of

the subject property was "necessary to carry out" petitioner's obligations under the franchise agreement.

E. <u>Analysis</u>

1. <u>The Equipment To Be Installed by Petitioner in the Livonia Cable Television System Is Described In Sufficient Detail in the Pre-1986 Documents To Permit a Determination of Whether the Equipment Actually Installed Is "Readily Identifiable With" Such Documents</u>.

a. <u>Relevant Case Law</u>

We are not the first court called upon to interpret the term "readily identifiable with", as that term is used in section 204(a)(3). The meaning of that term has been addressed in three cases by four different courts.[8] In two of those cases, <u>Bell Atl. Corp. v. United States</u>, 82 AFTR 2d 98-7375 at 98-7384, 99-1 USTC par. 50,119 at 87,041 (E.D. Pa. 1998), affd. __ F.3d __ (3d Cir., Aug. 17, 2000), and <u>United States v. Zeigler Coal Holding Co.</u>, 934 F. Supp. 292, 295 (S.D. Ill. 1996), the courts reasoned that, in order to be eligible for transition ITC under the transition rule for supply or service contracts, "the property must have been specifically described" in the contract or in a related document. In both cases, the District Court relied upon

---

[8] In a fourth case, <u>Southern Multi-Media Communications, Inc. v. Commissioner</u>, 113 T.C. 412 (1999), discussed below, we recently addressed the issue of whether improvements to a cable television system were "necessary to carry out" the applicable franchise agreements. We specifically refrained from deciding "whether * * * [the improvements] were 'readily identifiable with' * * * [the cable] franchise agreements." <u>Id.</u> at 422 n.3.

the language of the conference report quoted above and stated that "[t]o allow a supply contract to implicitly require the acquisition of property means that the transition rule exception would swallow the rule eliminating the ITC."

In the third case, United States v. Commonwealth Energy Sys., 49 F. Supp. 2d 57 (D. Mass. 1999), the taxpayer sought transition ITC for post-1985 capital additions to its existing power plant in connection with its performance of four pre-1986 power supply contracts.  The contracts specifically required the taxpayer "to cause to be built a new conventional steam plant * * * of an expected net economic capability of approximately 560 megawatts".  Id. at 59.  Because the contracts specified both the primary energy source and the total generating capacity, the Court reasoned that the facts of the case were precisely the facts of the following colloquy that occurred during Senate debate of the ITC transition rule for supply or service contracts:

> MR. MATSUNAGA: I would like to ask the bill managers to clarify another point.  The supply or service contract transition rule requires that the property be readily identifiable with and necessary to carry out the contract.  The committee report explains that the specifications and the amount of the property must be readily ascertainable from the terms of the contract or from related documents.
>
> Is this Senator's understanding correct that the requirement is met when a binding power purchase contract specifies the type of generating equipment in terms of primary energy source and specifies the amount of generating equipment in terms of total generating

capacity of the turbines necessary to produce the contracted power?  In other words, the rule does not require the technical details of the generating property to be spelled out.

MR. PACKWOOD:  The Senator from Hawaii is correct.

MR. LONG:  The Senator's understanding is correct.

132 Cong. Rec. 15028 (1986).

The court held that, "in the power supply context * * * generating equipment/property is 'readily identifiable with' the written supply contract where the contract specifies (1) the primary energy source; and (2) the total generating capacity." United States v. Commonwealth Energy Sys., supra at 60.  In reaching that result, the court rejected as "unduly narrow" the Government's interpretation of the statute and conference report "as a manifestation of congressional intent to limit the transition tax credit provision to property explicitly designated in a supply contract."  Id. at 58.

b.  Discussion

In deciding whether to grant or deny respondent's motion, we find it unnecessary to resolve the parties' conflicting interpretations of the phrase "readily identifiable with".  Rather, we find that the description contained in the pre-1986 documents of the equipment to be utilized in installing and maintaining the Livonia cable system is sufficiently detailed for us to determine whether any particular property is "specifically described" in such documents.  Thus, assuming arguendo that

"specifically described" is the applicable standard for determining entitlement to transition ITC in this case, as argued by respondent, we find that such standard is satisfied in the pre-1986 documents.

Petitioner has been unable to furnish "any documents contemporaneous with * * * [the audit years], such as equipment invoices, purchase orders, or budget approval documents * * * to provide an itemized identification of the alleged Transitional Property."  However, we do not consider petitioner's inability, to date, to specifically identify the subject property as grounds for granting respondent's motion.  The general categories of expenditures for equipment described in MetroVision's charts of account and general ledger materials for the audit years (which we accept as accurate only for purposes of respondent's motion) are consistent with the descriptions of equipment contained in the pre-1986 documents.  Therefore, we cannot conclude, as a matter of law, that the subject property (as represented in MetroVision's charts of account and general ledger materials) is not "specifically described" in such documents.  We also conclude that even updated versions of the equipment described in the pre-1986 documents that petitioner acknowledges were installed in the Livonia cable television system during the audit years may be said to be "specifically described" in and, therefore, "readily identifiable with" such documents in light of the requirement to

provide state-of-the-art equipment, including equipment that will "meet or exceed" the material requirements contained in the MetroVision application.

c. Conclusion

For the above reasons, we shall deny respondent's motion.[9]

2. There Are Genuine Issues of Material Fact in Determining Whether the Property Placed in Service by Petitioner During the Audit Years Is "Readily Identifiable With and Necessary to Carry Out" the Livonia Franchise Agreement.

a. Discussion

Petitioner attempts to compensate for its inability, to date, to document the items of subject property actually placed in service during the audit years by relying upon the sworn statements of its two experts, Messrs. Bjorklund and Kearse, to the effect that all of the subject property "was placed in service solely in order to provide cable television service to residents of Livonia as required by the Livonia Franchise Agreement" and that "this property was necessary for an operational cable system." Respondent disputes these conclusions on the basis of the affidavit of his expert, Mr. Gramlich, who

---

[9] As indicated supra in sec. III.A., our denial of respondent's motion is not intended to imply our agreement with petitioner that all of the property actually used by MetroVision in extending and maintaining the Livonia cable system is "readily identifiable with" the Livonia Franchise Agreement. Because of petitioner's inability to document the subject property, whether such property is "readily identifiable with" the franchise agreement remains an issue of fact to be resolved at trial.

states that business reasons, not franchise agreements, ultimately determine equipment acquisitions. Respondent argues that, without more information regarding the property actually placed in service during the audit years, there is an issue as to whether all such property was "necessary to carry out" the Livonia Franchise Agreement.

Recently, in Southern Multi-Media Communications, Inc. v. Commissioner, 113 T.C. 412 (1999), we considered whether certain improvements to cable television systems were "necessary to carry out" the cable franchise agreements and, therefore, eligible for transition ITC under section 204(a)(3). The case involved "rebuilds" (replacement of cable equipment to effect an increase in the maximum channel capacity of the system) and "line extensions" (extensions of the system to additional customers). We determined that neither the franchise agreements nor any other pre-1986 contracts specifically required the rebuilds or the line extensions. We, therefore, held that those improvements were not "necessary to carry out" the franchise agreements and, on that basis, denied transition ITC to the taxpayer.

The taxpayer had argued that the rebuilds and line extensions were made necessary by language in the franchise agreements requiring taxpayer to maintain the cable systems in a state-of-the-art condition. We rejected the taxpayer's argument on the basis that "[t]he word 'necessary' connotes essential,

mandatory, indispensable, or requisite", and that the state-of-the-art requirement, as set forth in the franchise agreements, reflected "only broad industry standards, not specific contractual commitments to undertake rebuilds." Id. at 418, 421. Similarly, we found no evidence to indicate that the taxpayer "had specific binding commitments, as of December 31, 1985, to install the line extensions." Id. at 422.

Under our opinion in Southern Multi-Media Communications, Inc., in order to prove that property placed in service during the audit years was "necessary to carry out" the Livonia Franchise Agreement, petitioner must demonstrate that such property was placed in service pursuant to "specific contractual commitments" contained in the franchise agreement or in a related (pre-1986) document. Petitioner argues that it has satisfied that requirement because MetroVision was "at all times material engaged solely in the business of providing cable television service to residents of Livonia, under the authority of the Livonia Franchise Agreement" and because MetroVision "installed each unit of property solely to provide cable television service to residents [of the City of Livonia] as it agreed to do in the Livonia Franchise Agreement."

We agree with respondent that there are genuine issues of material fact to be resolved in determining whether all of the property placed in service by petitioner was "necessary to carry

out" the Livonia Franchise Agreement.  In the existing record, there is inadequate identification of the items of property that were actually placed in service during the audit years.  Even if we were to assume that all such items of property fit within the general categories listed in petitioner's charts of account, it is possible that "business considerations", not the franchise agreement, led to the installation of one or more items.  If, for example, any of such items exceeded the performance capabilities called for by the franchise agreement, they would not have been placed in service pursuant to a specific contractual commitment. In addition, it is not clear what portion, if any, of the property consisting of "updated versions" of equipment illustrated in MetroVision's application may have qualified for transition ITC.[10]  That all such items may have been installed to

---

[10] One justification for such upgrades is the requirement, in the Livonia Franchise Agreement, to construct and maintain the Livonia cable system "at a state-of-the-art level in accordance with applicable requirements and specifications of the National Electrical Code, the rules and regulations of the [FCC], and all other pertinent ordinances and codes of [the City of Livonia]." That state-of-the-art requirement, together with a specific definition in the franchise agreement of the term "state-of-the-art equipment", and the requirement that MetroVision "meet or exceed * * * the material construction and service requirements" of its franchise application may provide the objective touchstone that was lacking in Southern Multi-Media Communications, Inc. v. Commissioner, 113 T.C. 412, 414 (1999), where the franchise agreements required the cable systems to be maintained "in accordance with the highest accepted standards of the industry to the end that the subscriber may receive the highest and most desirable form of service."  Depending upon the nature and extent of the upgrades in this case, it is possible that one or more was needed to satisfy what we consider to be an explicitly defined state-of-the-art contractual requirement in the Livonia Franchise
(continued...)

provide cable television service to the residents of the City of Livonia is not sufficient to establish that they were "necessary to carry out" the agreement.[11]

As indicated _supra_ in footnote 9, the same uncertainties, which are the result of petitioner's failure to document the items of the subject property actually placed in service during the audit years, raise material issues of fact whether such property is "readily identifiable with" the Livonia Franchise Agreement.

---

[10] (...continued)
Agreement.

Even in the absence of a state-of-the-art requirement, however, it is possible that an upgrade might qualify for transition ITC, e.g., where a broken part in need of replacement is obsolete and no longer in production. Thus, if the channel capacity increase from 60 to 62 channels acknowledged by Mr. Bjorklund truly was "incidental" to an otherwise required use of upgraded models of equipment described in the pre-1986 documents (e.g., where the upgrade was the only model readily available for use at the time of installation) it may be that the upgrade was "necessary to carry out" the franchise agreement.

[11] In this case, the issue is whether the equipment used to carry out contractually required service obligations was "necessary to carry out" such obligations. In _Southern Multi-Media Communications, Inc. v. Commissioner_, _supra_, it was the contractual need to perform the service obligations themselves (i.e., the rebuilds and line extensions) that was in issue. Because we held that the service obligations were not "necessary to carry out" the franchise agreement, it followed that none of the equipment could qualify for transition ITC. In this case, because the service obligations are required by the franchise agreement, we must determine, after a trial, which specific items of equipment were "necessary to carry out" those obligations and which were not. Therefore, the two cases involve somewhat different applications of the principle that there must exist a "specific contractual commitment" for equipment placed in service if such equipment is to qualify for transition ITC.

b.  <u>Conclusion</u>

Because there are genuine issues of material fact in determining whether all of the subject property is "readily identifiable with and necessary to carry out" the Livonia Franchise Agreement, we shall deny petitioner's motion.

IV.  <u>Conclusion</u>

Both petitioner's and respondent's motions for partial summary judgment shall be denied.

To reflect the foregoing,

<u>An appropriate order</u>

<u>will be issued</u>.